# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-KA-01341-SCT

*AMANDA GOFORTH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/13/2010 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES W. WRIGHT, JR. |
| | L. BROOKS HOOPER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND RENDERED - 09/15/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND PIERCE, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Amanda Goforth, a former high-school teacher, was indicted on five counts of sexual battery involving one of her former students. She was convicted on two counts and acquitted on the remaining three. Because we find that Goforth was not afforded a constitutionally adequate opportunity to confront one of the witnesses against her, we reverse. Further, we find that Goforth's conviction and sentence must be reversed and rendered. Any subsequent

reprosecution would subject Goforth to the dangers of double jeopardy due to the multiple, identically worded counts in her indictment and the jury's split verdict.

## FACTS AND PROCEDURAL HISTORY

¶2.     From 2008 to 2009, Amanda Goforth taught biology at Newton County High School. Her husband worked in oil fields in Texas on a two-week-on, two-week-off basis. Their only child was less than two years old during that time.

¶3.     Both years, Goforth taught a troubled student named Jane Doe.[1] Around January 2009, soon after Doe's fifteenth birthday, Goforth began mentoring her. Doe had spent the prior semester in alternative school[2] after having been caught in possession of illegal drugs at the high school. Doe had been having problems at home as well. Goforth gave Doe some clothes and, at one point, even contacted the Mississippi Department of Human Services (MDHS) concerning Doe.

¶4.     In November 2009, Goforth reported Doe's drug-use problems to Newton County High School Principal Ken Stringer and to Newton County Deputy Sheriff Mark Spence, who served as a school resource officer for the Newton County School District.[3] Deputy Spence, it turned out, had prior and ongoing investigations of Doe concerning drug

------

[1] We use a fictitious name to protect the minor's identity.

[2] "Alternative school," according to Newton County Deputy Sheriff Mark Spence, "is a school where students that are having trouble functioning for one reason or another, could be behavioral problems, drug problems, what have you, it'd be a school that they would be sent to."

[3] Deputy Spence explained that a "school resource officer" is "basically . . . a cop in school." "It'd just be a police officer that would be assigned to a school district[,] and they'd take care of security and other type details," Spence explained.

possession and two stolen cell phones.[4]  About this same time, Deputy Spence learned about accusations of sexual impropriety between Goforth and Doe.

¶5.    On November 23, 2009, Deputy Spence spoke with and obtained a statement from Doe.  Later that same day, Deputy Spence interviewed Goforth at the Newton County Sheriff's Department.  Deputy Spence informed Goforth of her *Miranda*[5] rights; thereafter, Goforth executed a waiver-of-rights form and gave a statement.

¶6.    Goforth stated that, following Doe's stint in alternative school, she had donated clothes to Doe and had tried to mentor her.  She said that Doe had spent the night at her house on one occasion.  Goforth recounted that a sobbing Doe had called her one evening and said that she had nowhere to stay.  Goforth thus allowed Doe to spend that one night in a spare bedroom.

¶7.    Deputy Spence specifically asked Goforth whether she had ever considered adopting Doe.  Goforth said that adoption had never been a serious option.  She explained that Doe had wanted her and her husband to adopt Doe.  Goforth said that her and Doe's relationship had soured after Goforth and her husband chose not to adopt Doe.  She said that Doe had

---

[4]  On November 23, 2009, or just before that date, teachers approached Doe concerning two stolen telephones.  Some pills, Klonopin and Xanax, were found on her at that time.  Doe eventually pleaded guilty to stealing the cell phones and to possessing the pills.

[5]  "The *Miranda* warning requires that, before subjecting a person in police custody to interrogation, law enforcement officers must inform the person that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Chamberlin v. State*, 989 So. 2d 320, 332 (Miss. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

3

become upset about their decision, and that Doe had returned to using drugs once again as a result.

¶8.    It was not until after Doe had returned to using drugs, according to Goforth, that Doe began to exhibit a desire to be more than friends.  Goforth said that Doe had started calling and texting her more frequently.  Then, in August or September of 2009, Doe had tried to break into her house.  "[Doe] called me and told me to let -- let her in my house, and I said no. . . . [T]hen she[] beat[] on my windows and she scared me . . . ," Goforth said.  Goforth stated that she had called the police about this incident, but that she did not press charges against Doe because "she was drunk, and she had been on drugs, and I wanted to give her a second chance."

¶9.    Deputy Spence then mentioned that he already had taken a statement from Doe and from Doe's friend, Chase Rigdon, and he informed Goforth that he had a cell phone with some incriminating photos.[6]  Goforth, at that point, said that she was not saying anything further.  Yet, after a few further exchanges, Goforth continued to talk.

¶10.    Goforth told Deputy Spence that Doe had had men drive her to Goforth's house, and that Doe had threatened Goforth and her eighteen-month-old child if Goforth did not engage in sexual activity with her.  Goforth said that Doe had told her that she and John Thomas Roberts, Doe's then-boyfriend, would take Goforth's child to Mexico if Goforth did not comply with Doe's desires.  Goforth said that the mention of Roberts's name had especially

---

[6] This assertion proved to be false. Deputy Spence explained at trial that police did, in fact, have a cell phone in their possession, and that they had obtained a statement from another person who said that they had seen incriminating photos on that particular phone. The officers, however, were never able to actually retrieve the pictures from the cell phone.

4

frightened her. Goforth and Roberts had dated in the past. She described Roberts as "bad," and alluded that Roberts had forced her to do things in the past. Goforth added that Roberts was the only person whom she had ever bailed out of jail.

¶11. Goforth further alleged that Doe had threatened to kill her "multiple times." She said that she even had in her possession a piece of paper with a note from Doe that read: "come with me or die." Goforth explained that "come with me" meant going to Mexico with Doe. This note, in fact, was later produced it trial. Exhibit D-1 is a small, half-torn post-it note that reads "would you rather die or go with me?"

¶12. Goforth acknowledged that she had engaged in sexual activity with Doe on five occasions, beginning in May 2009, and that Doe had made Goforth use a dildo each time. Goforth said that on the final encounter, Doe had shown up with Rigdon, that Rigdon had had a gun, and that she had been forced to have sex with Rigdon as well. Goforth said that Rigdon and Doe had returned to her house again on a later date, and that Doe had sought to come inside. Goforth said that she had called the police at that point because she had had enough. When asked why she had not contacted the police before then, Goforth replied, "Because I was scared that this would happen, and I would be in the wrong, and I was trying to get her sent back to alternative school because you know she's had drugs."

¶13. At trial, Newton County Deputy Sheriff Chris Hollingsworth testified that police had been called out to Goforth's house one evening. Deputy Hollingsworth could not recall any dates, but he confirmed that he had been one of the four officers who had responded to a call about an attempted break-in by Doe. He recalled finding Rigdon sitting inside a vehicle.

5

Doe, he said, was apprehended and taken to the sheriff's department until her mother came and picked her up. Deputy Hollingsworth said that Goforth did not press charges.

¶14. Toward the conclusion of Goforth's interview with Deputy Spence, he asked Goforth whether the dildo belonged to her, or whether Doe had brought it to Goforth's house. Goforth claimed that Roberts had bought it. She said that the dildo was still at her house, and she consented to accompanying Deputy Spence to retrieve it. Goforth later executed a waiver-of-search form. That same evening, Goforth, Deputy Spence, Deputy Jeremy Pinson, and Angela Spence, an administrative assistant with the Newton County Sheriff's Department,[7] all traveled to Goforth's home. Goforth retrieved the dildo from a bedroom dresser drawer. She was arrested and charged later that evening.

¶15. Shortly thereafter, on December 1, 2009, the Newton County School District notified Goforth that she was being terminated for "inappropriate relationships of a sexual nature with students." The school district informed her that she had the right to a termination hearing, which Goforth requested.

¶16. A termination hearing was conducted on January 25, 2010. Doe testified. Doe said that Goforth had been forced to engage in sexual relations with her under threats. Doe testified that, in the first sexual encounter, Roberts had accompanied her to Goforth's house and that Roberts had a gun. She said that Roberts had threatened to hurt Goforth's son if Goforth did not do as they asked. Doe also stated that she had physically beaten Goforth on one occasion.

---

[7] Angela Spence is Deputy Mark Spence's sister-in-law.

I did write a threatening letter and I did hit her -- . . . So, if that is what you call a "threat," then, yes, I did threaten her, but I did not hold a gun to her head and was like "you got to have sex with me." I just wrote that letter, and I literally beat the crap out of her.

Doe said that Goforth had had to go to the doctor as a result of this beating.

¶17. The school district terminated Goforth following the hearing.

¶18. On June 1, 2010, Goforth was indicted on five counts of sexual battery under Section 97-3-95(1)(c) of the Mississippi Code.[8] A trial was held on August 9-10, 2010. The State called Doe as its first witness.

¶19. At trial, Doe testified that she had lied under oath at the termination hearing. She asserted that Roberts had never been involved, and claimed that she had fabricated the threatening conditions at Goforth's behest. Doe stated that she had called Goforth in December 2009, after Goforth had been arrested, and that Goforth had instructed her to tell the authorities that Goforth had acted under threats. "[Goforth] told me if I said this [about the threats] at the [termination] hearing that day, we wouldn't have to be here today," Doe said. Doe maintained that she had tried to protect Goforth at the termination hearing. She said that she had decided to tell the truth, however, after Goforth had begun accusing her of harassment and had started implicating her, instead of Roberts, as the person who actually made the threats.

---

[8] Section 97-3-95(1)(c) of the Mississippi Code states that "[a] person is guilty of sexual battery if he or she engages in sexual penetration with . . . [a] child at least fourteen (14) but under sixteen (16) years of age, if the person is thirty-six (36) or more months older than the child . . . ." Miss. Code Ann. § 97-3-95(1)(c) (Rev. 2006).

¶20.   According to Doe, Goforth began mentoring her around January 2009. Sometime in April or May 2009, their relationship became sexual. Doe said that the two of them exchanged cell phone numbers and began texting. Their first sexual encounter, Doe said, occurred at Goforth's former house. Doe asserted that Goforth had the dildo already, that they had used the dildo to sexually penetrate each other, and that they had performed oral sex on each other as well. Doe said that Goforth's child was the only other person in the home at that time.

¶21.   Doe testified that she and Goforth had had four other sexual encounters, all of which occurred at Goforth's new house. Three took place in the summer of 2009, and one occurred in August or September, after school had started. Doe said that she and Goforth had sexually penetrated each other with the dildo during each encounter.

¶22.   According to Doe, another individual was present during two of those five encounters. Doe said that Jacob Moore, whom she had dated in the summer of 2009, had accompanied her to Goforth's home on one occasion. Doe stated that Moore had stayed in the living room briefly, and then had walked outside while she and Goforth were in the bedroom. She said that Moore had not known about her and Goforth's relationship. Doe also claimed that, during this particular encounter, she and Goforth "started play fighting," that "it got a little rough," and, as a result, Goforth had received a small red mark on her side.

¶23.   Moore's testimony at trial corroborated Doe's account. Moore confirmed that he had accompanied Doe to Goforth's house during the summer of 2009. He said that Doe and Goforth had gone into a back bedroom, and that they had stayed there for about twenty to thirty minutes. He said that he had hung out in the living room for a minute, and then had

8

gone outside to smoke a cigarette. Moore testified that when Goforth and Doe had returned from the bedroom, Goforth had told Moore that Doe had hit her. Goforth then showed Moore a bruise on her side. Moore said that he had not witnessed any sexual activities, nor had he seen any threats by Doe toward Goforth.

¶24. Aside from Moore, Doe said that Rigdon, whom she described as her "best friend" or "boyfriend," was present during her and Goforth's fourth or fifth encounter. Doe claimed that, on that particular occasion, she and Goforth had engaged in sexual activity and that Rigdon eventually had joined them. She said that Rigdon and Goforth had had sex then.

¶25. The State later called Rigdon to the stand. Rigdon had given a written statement to police on November 23, 2009. His statement, which is discussed in more detail later in this opinion, corroborated Doe's testimony. He said that Goforth willingly had engaged in sexual activity with both him and Doe. Coincidentally, between the time that Rigdon gave this statement and trial, he was severely injured in automobile accident. He testified that, as a result of the accident, he could not remember having made the written statement to the police or having ever known Goforth or Doe. Rigdon affirmed that he recognized his signature at the bottom of the statement, and he "guessed" that the statement itself was his.

¶26. Deputy Hollingsworth testified immediately after Rigdon. Deputy Hollingsworth stated that he was present when Rigdon provided the written statement. The trial court, over Goforth's objection, subsequently allowed Rigdon's statement to be read into evidence.

¶27. Doe testified that her and Goforth's sexual relationship came to light as rumors began to surface. Doe said that Goforth had told her that they had to stop seeing each other because their relationship was wrong. Doe stated that she then had begun taking pills, and that, while

9

she was high, she had written Goforth a note that stated "would you rather die or go with me?" Doe provided the following explanation as to what she meant: "[Goforth] told me if I ever told anybody [about us] [that] she was going to kill herself, and I was saying either you're going to have sex with me or I'm going to tell, so if I tell, you're going to kill yourself."

¶28. Doe also spoke about the evening that she and Rigdon had gone to Goforth's house, and Goforth had called the police. Doe said that she had been drunk that night, that she had needed a shower to sober up, and that she had wanted something to eat as well. She stated that Goforth had thought that she was trying to break into her house, and that Goforth had threatened to call the police if she did not leave. Doe said that police had arrived eventually, and that they had taken her to the police station, where she had waited for her mother to pick her up.

¶29. At the conclusion of her testimony, Doe said that she "felt like" she loved Goforth, and said that she still had feelings for her. She also said that she did not want Goforth to be prosecuted or sent to jail.

¶30. When the State sought to admit Goforth's statement to Deputy Spence, Goforth objected. The trial court thus conducted a suppression hearing outside the presence of the jury. Following the hearing, the trial court admitted Goforth's statement.

¶31. Goforth elected not to testify. During her case-in-chief, she called Don and Jeanie Vares, co-owners of Zack Garvin's Steakhouse in Newton, and City of Newton Chief of Police Harvey Currie as witnesses. They all testified about an incident that had occurred less than two months before trial. While working at Garvin's Steakhouse one evening, Goforth

had received four or five suspicious telephone calls from an anonymous source. The calls had prompted Jeanie and Goforth to contact Chief Currie. That evening, Jeanie, Don, Chief Currie, and Goforth's father, Jimmy Wyatt, had escorted Goforth to her vehicle. When they had reached her vehicle, they found a Taco Bell condiment package that read "marry me" attached to the vehicle window. About the same time, Don had noticed a sports car parked alongside an adjacent highway; Chief Currie pursued the vehicle. He testified that the driver of the vehicle was Doe. Doe was questioned and charged with harassment.[9]

¶32. As her final witness, Goforth called Jan Boggs, a licensed psychologist. Goforth's attorney had referred Goforth to Boggs in January 2010, and Boggs had seen Goforth every two weeks since that time. Boggs had collected a personal history of Goforth, had conducted a mental-status evaluation, and had observed Goforth over a long period of time. She had diagnosed Goforth with major depression and post traumatic stress disorder, which Boggs described as an "intense anxiety disorder, both acute and chronic, that usually results from some type of trauma that the person has been through or . . . a series of traumatic events." Boggs believed that this disorder had begun near the time that Goforth had graduated from high school and had entered college. Boggs said that Goforth had suffered from this disorder in 2009. This disorder or condition, Boggs said, would have made Goforth "very vulnerable" and "very susceptible" to destructive psychological influences.

¶33. At the conclusion of trial, the jury found Goforth guilty on two counts and not guilty on three counts. For Count I, the trial court sentenced Goforth to serve thirty years in the

---

[9] The harassment charges against Doe had not been brought to court at the time of Goforth's trial.

custody of the Mississippi Department of Corrections (MDOC), with five years suspended and five years on supervised probation, and ordered Goforth to pay a fine of $10,000. On Count II, Goforth was sentenced to serve five years, to run consecutively with Count I. Altogether, she received a thirty-year sentence.

¶34. Goforth now raises five issues on appeal. First, she argues that her statement should have been suppressed for two reasons: (1) it was the involuntary product of coercion, and (2) Deputy Spence failed to honor scrupulously her invocation of her right to remain silent. Second, she contends that her Confrontation Clause rights under the Sixth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution were violated by the admission of Rigdon's prior written statement to police. Third, she asserts that certain improper remarks by the State during closing arguments necessitated a mistrial. Fourth, she challenges the sufficiency of the evidence. And, finally, she maintains that any subsequent retrial would violate her Fifth Amendment right to be free from double jeopardy.

¶35. We need address only two issues: (1) whether the admission of Rigdon's statement violated Goforth's constitutional right to confront the witnesses against her, and (2) whether double-jeopardy concerns preclude any subsequent reprosecution.

I. **Whether the admission of Rigdon's statement violated Goforth's constitutional right to confront the witnesses against her.**

¶36. "This Court reviews de novo a Confrontation Clause objection." **Smith v. State**, 986 So. 2d 290, 296 (Miss. 2008) (citing **Hayden v. State**, 972 So. 2d 525, 535-36 (Miss. 2007)).

¶37. A written statement signed by Chase Rigdon, dated November 23, 2009, was admitted and read before the jury at trial. In the statement, Rigdon said that he had accompanied Doe

12

to Goforth's house one Friday night and that Goforth had been drinking. He said that he had stayed outside while Doe and Goforth took a shower. Goforth later had walked to the door "completely naked" and had invited him into the back with her and Doe. Rigdon said that, shortly thereafter, he had gone into Goforth's bedroom and had found her and Doe engaged in sexual activity. Both had asked him to climb into the bed with them. He then had had sex with Goforth. Rigdon said that Doe had become angry with him afterwards, and that Goforth had had to calm her down. Rigdon said that he eventually had gone to sleep. The next morning, he had found Doe passed out on the floor naked. He said that he had awakened Doe, had gotten her dressed, and that the two of them had left Goforth's house.

¶38. The State called Rigdon as a witness at trial. A January 2010 automobile accident had substantially impaired his physical and mental conditions. He was confined to a wheelchair, and he testified that he could not remember anything that had occurred two years prior to the wreck. "I can't remember probably half my life," Rigdon said. He did not recall having known Doe or Goforth prior to the wreck. He could not remember going to Goforth's house, speaking to any officers about the alleged incident, or writing out a statement. He recognized his signature at the bottom of the statement, but he could only "guess" that the statement itself had been written by him.

¶39. Following Rigdon's testimony, Deputy Hollingsworth testified that he was present when Rigdon provided the statement. The State then sought to admit Rigdon's statement under Rule 803(5) of the Mississippi Rules of Evidence.[10] Goforth objected on the basis that

---

[10]  Rule 803(5) of the Mississippi Rules of Evidence, the "recorded recollection" exception provides for the admission of:

13

Rigdon was unavailable as a witness, that she had a constitutional right to cross-examine the witnesses against her, and that, under Rule 403, the statement's probative value was substantially outweighed by the danger of unfair prejudice. The trial court ruled that Rigdon was available to testify, and that Rule 803 applied regardless of whether the witness was available. The trial judge further found that Ridgon had been able to confirm his signature, and that Deputy Hollingworth had testified to being present when Rigdon had made the statement. The trial judge thus admitted Ridgdon's statement and overruled Goforth's *ore tenus* motion for a mistrial.

¶40. Goforth argues that the Confrontation Clauses in both the federal and state constitutions were violated because she was not able to confront Rigdon about his prior statement. His complete memory loss, she contends, rendered him essentially unavailable for cross-examination.

¶41. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Article 3, Section 26, of the Mississippi Constitution affords this same right. Miss. Const. art. 3, § 26. It states that "[i]n all criminal

---

A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

M.R.E. 803(5).

14

prosecutions the accused shall have a right . . . to be confronted by the witnesses against him." *Id.*

¶42.   Since Article 3, Section 26 of the Mississippi Constitution provides defendants a constitutional right to confront the witnesses against them, we base our opinion on its provisions. *See Cannaday v. State*, 455 So. 2d 713, 722 (Miss. 1984).   Federal caselaw serves as our guide, but Mississippi jurisprudence compels the result. *Id.* (citing *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)).

¶43.   We begin by noting that, even if Rigdon's statement was admissible under the "recorded recollection" hearsay exception of Rule 803(5), it is still subject to scrutiny under the Confrontation Clause. In *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 1370, 158 L. Ed. 2d 177 (2004), the Supreme Court stated that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence . . . ."   Testimonial statements encompass signed, written statements made during an "interrogation[] solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." *Davis v. Washington*, 547 U.S. 813, 826, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).   No one here disputes that Rigdon's prior statement was testimonial.   For it to be admissible, therefore, the demands of the Confrontation Clause must be satisfied. *Crawford*, 541 U.S. at 61-69.

¶44.   The facts of this case are remarkably similar to a case decided years ago by the California Court of Appeal for the Fourth District. In *People v. Simmons*, 123 Cal. App. 3d 677, 679, 177 Cal. Rptr. 17 (Cal. Ct. App. 1981), Jackson gave police a written statement that

15

implicated Simmons in an arson. But prior to Simmons's preliminary hearing, Jackson suffered a severe head injury that caused amnesia. *Id.* He was unable to recall any admission Simmons had made to him, or that he had ever even made a statement to police. *Id.* Moreover, although he recognized his signature, he could not verify that the contents of the statement were from him. *Id.* The trial court, additionally, found no indication of evasiveness or selective memory. *Id.* at 680-81. Nevertheless, it admitted Jackson's statement as a past recollection recorded. *Id.* at 679. The California Court of Appeal held that the admission of Jackson's statement had denied Simmons his constitutional right to confrontation. *Id.* at 681-82. The court reasoned that an accused must have the ability to *meaningfully* confront and cross-examine the witness against him or her. *Id.* at 681 (citing ***California v. Green***, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)) (emphasis added).

¶45. Two more recent California Court of Appeals decisions have concluded that ***Simmons*** was abrogated by the Supreme Court's decision in ***United States v. Owens***, 484 U.S. 554, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988). ***People v. Gunder***, 151 Cal. App. 4th 412, 419 n.7, 59 Cal. Rptr. 3d 817 (Cal. Ct. App. 2007); ***People v. Cowan***, 50 Cal. 4th 401, 468, 236 P.3d 1074 (Cal. Ct. App. 2010).

¶46. In ***Owens***, the Supreme Court addressed whether a Confrontation Clause violation can be based upon a witness's loss of memory. ***Owens***, 484 U.S. at 557. In that case, a prison correction counselor had sustained severe memory impairment after being beaten with a metal pipe. *Id.* at 556. When the counselor first spoke with the FBI, he was unable to remember his attacker's name. *Id.* Weeks later, in a second interview with an FBI agent,

16

he was able to describe the attack, name his attacker, and identify his attacker from a photo line-up. *Id.* At trial, the counselor recounted what he had been doing just prior to the attack, described feeling blows to his head, and recalled seeing blood on the floor. *Id.* He also vividly remembered identifying the defendant as his assailant during the second interview. *Id.* at 556, 565. On cross-examination, however, he acknowledged that he could not remember seeing his assailant at the time of the assault. *Id.* at 556. And, even though he had received numerous visitors during his hospital stay, the counselor could not remember any of them except one, nor could he recall if any of those visitors had suggested that the defendant was his attacker. *Id.* Defense counsel unsuccessfully sought to refresh the counselor's recollection with hospital records, which showed that he had, at one point, attributed the assault to someone other than the defendant. *Id.* The Supreme Court held that no Confrontation Clause violation had occurred. *Id.* at 559-60. "'[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* at 559 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S. Ct. 2658, 2664, 96 L. Ed. 2d 631 (1987)). The Court explained that the opportunity for cross-examination "is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief." *Owens*, 484 U.S. at 559. It is sufficient, rather, "that the defendant has the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination . . . ) the very fact that he has a bad memory." *Id.* The Court reasoned that there are "realistic weapons" to attack a witness's statement when memory loss is

17

asserted. *Id.* at 560. In that particular case, for example, the defendant had emphasized the counselor's memory loss, and had argued that the counselor's identification of the defendant had been the result of a suggestion made by one of his hospital visitors. *Id.* The Court noted that these weapons may not always be successful, "but successful cross-examination is not the constitutional guarantee." *Id.*

¶47. Several years later, the Supreme Court in *Crawford* held that the Confrontation Clause requires that pretrial, testimonial statements made by a witness who is absent at trial are admissible only if the witness is unavailable and the accused had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 59. In footnote nine of its opinion, the Supreme Court reiterated that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at 59 n.9 (citing *Green*, 399 U.S. at 162).

¶48. In the wake of *Owens* and *Crawford*, many courts have found that a declarant's appearance and subjection to cross-examination at trial are all that is necessary to satisfy the Confrontation Clause, even if his or her memory is faulty. *State v. Holliday*, 745 N.W.2d 556, 566-67 (Minn. 2008) (citing cases from various jurisdictions). This Court, in fact, seemingly adopted this stance in a recent case involving a forgetful witness.

¶49. In *Smith v. State*, 25 So. 3d 264, 266-67 (Miss. 2009) (quoting *Smith v. State*, 25 So. 3d 313, 315-16 (Miss. Ct. App. 2008)), a shooting victim, Davis, gave a statement to police identifying Smith as the perpetrator. Davis told police that Smith had shot him following a dispute over some missing drugs, and said that he had seen Smith "face to face." *Smith*, 25 So. 3d at 315. Davis's testimony changed drastically at trial, however. *Id.* at 316. He denied

18

that he had seen Smith on the day of the shooting. *Smith*, 25 So. 3d at 267. When questioned about his prior statement, he acknowledged giving a statement, but said that he could not remember what he had said. *Id.* After reviewing the statement in an effort to refresh his memory, he confirmed that the statement was his and that he had implicated Smith in the statement. *Id.* But he maintained that his memory of the incident itself had not been refreshed. *Id.* The testimony he eventually offered contradicted his prior statement to police. *Id.* at 268. He testified that the shots had come from across the street, and that he had identified Smith only because his nephew had told him that Smith was the shooter. *Id.* On cross-examination, he said that his prior statements had been false. *Id.* The Court of Appeals held that the admission of the Davis's prior statements to police had violated Smith's right to confront his accuser. *Id.* at 269. The Court of Appeals reasoned that "'the 'Davis' who testified at Smith's trial was no longer the accusing witness against Smith.'" *Id.* (quoting *Smith*, 25 So. 3d at 324). This Court found such reasoning to be flawed. *Id.* at 269. We quoted *Crawford*'s proposition that "'when the declarant appears for cross-examination at trial, the Confrontation Clause places *no constraints at all* on the use of his prior testimonial statements.'" *Id.* at 269-70 (quoting *Crawford*, 541 U.S. at 59 n.9) (emphasis added)). And we pointed out that, under *Owens*, the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, and that a witness's memory loss has no bearing on whether he or she should be regarded as having been subject to cross-examination on the witness stand. *Smith*, 25 So. 3d at 270 (citing *Owens*, 484 U.S. 559-62). We concluded therefore that no Confrontation Clause violation had occurred: "Davis's appearance on the witness stand at trial provided Smith with the opportunity to confront and cross-examine him, which

19

is all that is required by the Confrontation Clause . . . . " *Id.* at 271 (citing *Crawford*, 541 U.S. at 68).

¶50. If the Confrontation Clause requires solely that the declarant be physically present and subject to cross-examination, its demands were satisfied in this case. Without question, Rigdon physically appeared at trial and was subject to cross-examination. But the United States Court of Appeals for the Seventh Circuit has noted that, according to *Crawford*, physical appearance alone is not necessarily dispositive. *Cookson v. Schwartz*, 556 F.3d 647, 651 (7th Cir. 2009).

¶51. In *Cookson*, Cookson argued that a certain witness was not "available" for Confrontation Clause purposes because the witness could not remember having made the prior statements to police. *Cookson*, 556 F.3d at 650. The State argued that no Confrontation Clause problem existed, because the witness had appeared at trial and Cookson had been able to cross-examine her. *Id.* at 651. The State pointed specifically to the familiar language in *Crawford* that "'when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.'" *Id.* (quoting *Crawford*, 541 U.S. at 59 n.9). But the Seventh Circuit said that this language was not dispositive. *Cookson*, 556 F.3d at 651. It pointed out that the Supreme Court elaborated on that statement just two sentences later: "'[T]he Clause does not bar admission of a statement so long as the declarant is present at trial to *defend or explain it*.'" *Id.* (quoting *Crawford*, 541 U.S. at 59 n.9) (emphasis added). After comparing the facts in *Cookson* to those in *Owens* and *United States. v. Keeter*, 130 F.3d 297 (7th Cir. 1997), the court concluded that Cookson had been afforded a constitutionally adequate opportunity to

examine the witnesses against him. ***Cookson***, 556 F.3d at 652. It noted that, unlike the witnesses in ***Owens*** and ***Keeter***, the witness in ***Cookson*** had been able to remember the underlying events described in her prior statements. ***Id.***

¶52. We find the Seventh Circuit's interpretation of footnote nine in ***Crawford*** to be insightful and persuasive. According to it, a fair reading of footnote nine is that the Confrontation Clause does not bar admission of a prior testimonial statement if the declarant appears for cross-examination at trial to defend or explain his or her statement. *See **id.*** at 651 (quoting ***Crawford***, 541 U.S. at 59 n.9). Importantly, the pertinent language does not require the record to actually show that the defendant did in fact defend or explain the statement. Roger W. Kirst, *Does Crawford Provide a Stable Foundation for Confrontation Doctrine?*, 71 Brook. L. Rev. 35, 76 (2005). The language, rather, focuses on "presence and ability to act." ***Id.***

¶53. We find that Rigdon, though physically present at trial, did not have the requisite, minimal ability or capacity to act. Significantly, no one here disputes that Rigdon's total loss of memory was genuine. The trial judge, in fact, stated that "[i]t is obvious to the Court that [Ridgon] suffers physical disabilities, and also a mental impairment in that he does not have recollection of matters that has [sic] occurred within his lifetime." Nothing in the record indicates that Rigdon's memory loss was feigned. He had no recollection of the underlying events surrounding his statement, and he could not even remember having known Goforth or Doe. It was, in his mind, as if the alleged events had never occurred. Additionally, he could not recall ever having spoken to police. The most he could do was verify his signature and "guess" that he had provided the written statement above it. This total lack of memory

21

deprived Goforth any opportunity to inquire about potential bias or the circumstances surrounding Rigdon's statement. In sum, Goforth simply had no opportunity to cross-examine Ridgon about his statement.

¶54. The case before us, furthermore, is distinguishable from both *Owens* and *Smith*. Though the declarant in *Owens* could not remember the underlying events surrounding his prior testimonial statement, he vividly recalled identifying the defendant when he had spoken to authorities. *Owens*, 484 U.S. at 556, 565. The defendant in that case also was able to cast doubt upon the identification and asserted that it had been based upon a suggestion by one of the individuals who had visited the defendant while he had been hospitalized. *Id.* at 560. Similarly, the supposedly forgetful witness in *Smith* remembered issuing a statement to police and confirmed that he had identified the defendant as the perpetrator. *Smith*, 25 So. 3d at 267. He even testified about some of the underlying events; his account at trial simply contradicted what he had told police in his earlier statement. *Id.* at 268. And, in *Smith*, there was reason to be suspicious about the witness's alleged memory loss. *Smith*, 25 So. 3d at 316 n.2 (noting that investigators had interviewed the witness six hours after he had been discharged from the hospital following treatment for a gunshot wound, and that his claimed total memory loss under such traumatic circumstances seemed "strangely suspect, at best"). The witness in that case was, after all, a prior convicted felon who recently had been released from custody and had a drug charge pending against him. *Id.* at 326 n.8. He testified that he had felt pressured to testify because he had been threatened with jail time if he did not. *Id.* at 319.

22

¶55. We find that, under the Mississippi Constitution, Goforth did not have a constitutionally adequate opportunity to cross-examine Rigdon at trial or beforehand. The goal of the Confrontation Clause is to assess the reliability of evidence by testing it in the crucible of cross-examination. *Crawford*, 541 U.S. at 60. We cannot say that Rigdon's statement was subjected legitimately to that crucible. Accordingly, we find that the admission of Rigdon's prior testimonial statement violated the Confrontation Clause in Article 3, Section 26 of the Mississippi Constitution.

¶56. Though we have found that Goforth's Confrontation Clause right was violated, constitutional errors alone do not entitle a defendant to automatic reversal. *Brown v. State*, 995 So. 2d 698, 704 (Miss. 2008) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). Most constitutional errors, rather, may be deemed harmless. *Brown*, 995 So. 2d at 704 (quoting *Recuenco*, 548 U.S. at 218). This includes Confrontation Clause violations. *Clark v. State*, 891 So. 2d 136, 142 (Miss. 2004).

¶57. The basic, harmless-error test in such instances is "'whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Brown*, 995 So. 2d at 704 (quoting *Thomas v. State*, 711 So. 2d 867, 872 (Miss. 1998)).

¶58. We cannot say beyond a reasonable doubt that the constitutional error in this case did not affect the verdict. Rigdon's prior testimonial statement was, perhaps, the most damaging evidence against Goforth. His statement corroborated, in greater detail, Doe's account of how Goforth willingly had engaged in sexual activity with her and Rigdon on one occasion. His statement thus lent credibility to Doe's trial version of the events.

23

¶59. Because we cannot say beyond a reasonable doubt that the constitutional violation in this case did not contribute to Goforth's conviction, we find that those violations were not harmless and constituted reversible error.

## II. Whether double-jeopardy concerns preclude any subsequent reprosecution.

¶60. This Court reviews claims of double jeopardy de novo. *Boyd v. State*, 977 So. 2d 329, 334 (Miss. 2008) (citing *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999)).

¶61. Goforth argues that we must reverse *and render* her conviction and sentence because any subsequent retrial would subject her to double jeopardy. She asserts that the indictment included five identical, sexual-battery counts, but that it failed to distinguish those counts in any way. The jury then returned a split verdict, acquitting her on three counts and finding her guilty on two counts. Because each of the five counts was identical, she maintains that there is no way to know which specific crimes she was convicted or acquitted on. This, she says, poses double-jeopardy concerns for any future retrial — she might be subject to reprosecution on one of the three counts for which she was acquitted.

¶62. Goforth's double-jeopardy argument centers around the multi-count indictment. Goforth, in fact, raised double-jeopardy concerns about the multi-count indictment early on at trial. In her pretrial motion to dismiss, she asserted that the indictment did not enable her "to plead to any judgment in the instant case as a bar to any later proceedings against [her] based on the same alleged offense." And, in her motion for judgment notwithstanding the verdict or, in the alternative, new trial, Goforth asserted that the indictment failed to put her on notice of all viable defenses, including any double-jeopardy defense.

24

¶63. The State insists that the double-jeopardy issue is not ripe for review. We disagree. This issue was raised at trial, is squarely before us today, and we are capable of deciding the issue based on the record before us.

¶64. The Double Jeopardy Clause of the Fifth Amendment provides that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend. V. This amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *Boyd v. State*, 977 So. 2d 329, 334 (Miss. 2008) (citing *Brown v. State*, 731 So. 2d 595, 599 (Miss. 1999)). The Mississippi Constitution affords this same right. Miss. Const. art. 3, § 22 ("[n]o person's life or liberty shall be twice placed in jeopardy for the same offense"). This Court has stated that "'[a]n indictment must contain . . . sufficient facts to enable [a defendant] to plead double jeopardy in the event of a future prosecution for the same offense.'" *Berry v. State*, 996 So. 2d 782, 786 (Miss. 2008) (quoting *Gilmer v. State*, 955 So. 2d 829, 836-837 (Miss. 2007)).

¶65. The indictment in this case stated that:

**AMANDA GOFORTH**

late of the County aforesaid, on or about <u>April 1, 2009 through October 30, 2009</u>, in the County and State aforesaid, and within the jurisdiction of this Court, as part of a continuing series of acts connected together and constituting one with the other parts of a common design, scheme and plan,

<u>COUNT ONE</u>

did willfully, unlawfully and feloniously engage in sexual penetration with H.P., a child over fourteen (14) years of age and under sixteen (16) years of age, when Amanda Goforth was more than thirty-six (36) months older than H.P., by inserting an object into the genital opening of H.P., contrary to and in violation of Section 97-3-95(1), Miss. Code Ann. (1972),

25

The four counts that followed all were worded identically.

¶66. In the recent case of ***Tapper v. State***, 47 So. 3d 95, 101 (Miss. 2010), this Court was confronted with an issue of first impression: whether a multi-count indictment that alleges identical acts of conduct places a defendant on sufficient notice of the essential facts constituting the charged offense and the nature and cause of the accusation. In that case, Tapper argued that a multi-count indictment that included four identical counts of touching a child for lustful purposes had failed to notify him of the nature and cause of the accusation against him, and that its failure to allege more specific dates had denied him the opportunity to present a full defense. ***Id.*** at 101. This Court held that the trial court had not erred in refusing to quash his indictment. ***Id.*** at 103. The Court found that the State had narrowed the timeframe of the indictment as much as it could, and that the State could not have provided more specific details than it did. ***Id.*** at 101-03.

¶67. The majority in ***Tapper*** discussed whether the touching-for-lustful-purposes conviction had merged with Tapper's sexual-battery conviction so as to violate the Double Jeopardy Clause. ***Id.*** at 101-03. Yet, it did not address the double-jeopardy implications posed by the multiple, identically worded counts in the indictment. ***Id.*** That particular issue had not been raised on appeal. ***Id.*** at 98. Justice Kitchens's separate opinion, however, did reach the issue. ***Id.*** at 107-08 (Kitchens, J., concurring in part and dissenting in part). He noted that the indictment left Tapper unable to assert double jeopardy in any subsequent prosecution for similar conduct — the identically worded counts would have made it impossible to tell if Tapper already had been tried on such a charge. ***Id.***

26

¶68. In his separate opinion in *Tapper*, Justice Kitchens cited a case from the United States Court of Appeals for the Sixth Circuit that sheds more light on the double-jeopardy issues before us. In *Valentine v. Konteh*, 395 F.3d 626, 628 (6th Cir. 2005), Valentine had been charged and convicted of forty counts of sexual abuse. The indictment included "20 'carbon-copy' counts of child rape, each of which was identically worded so that there was no differentiation among the charges and 20 counts of felonious sexual penetration, each of which was also identically worded." *Id.* The Sixth Circuit found the indictment was fatally flawed due to the lack of differentiation among the counts. *Id.* at 636. It stated that Valentine had "no way to determine what charges of a similar nature could be brought against him in the future if he were re-indicted." *Id.* at 628-29.

> We cannot be sure what double jeopardy would prohibit [in a subsequent prosecution] because we cannot be sure what factual incidents were presented and decided by this jury. If Valentine had been found not guilty, it is not clear to what extent he could ably assert that his acquittal barred prosecution for other similar incidents.

*Id.* at 635. The court thus held that the multiple, identically worded counts had deprived Valentine of protection from the danger of double jeopardy. *Id.* at 636. Because the State had shown substantial evidence of ongoing abuse, the court sustained one of the child-rape convictions and one of the penetration convictions, but it set aside the remaining thirty-eight convictions and held that Valentine could not subsequently be charged for the same crimes during the relevant time period. *Id.* at 628-29.

¶69. We find that, as in *Valentine*, the multiple, identically worded counts in the indictment here failed to protect Goforth's constitutional right against double jeopardy in the event of future prosecution. Neither the indictment nor the charging instruction differentiated

27

among the five counts. Although the jury stated that it had found Goforth guilty on counts one and two, but not guilty on counts three through five, there is no identifiable basis for their distinction among the counts. As a result, the basis for the jury's split verdict cannot be determined without conjecture.[11]

¶70. We already have found that reversal is in order. Should Goforth be retried, neither she nor anyone else would be able to determine on which specific charges she previously was acquitted or convicted. Accordingly, we hold that Goforth cannot be prosecuted again on these charges or for any same crimes that occurred during the time period set forth in her indictment.

## CONCLUSION

¶71. Goforth's state constitutional right to confront the witnesses against her was violated. We find that this violation constitutes reversible error. We further find that Goforth's constitutional right to be free from double jeopardy precludes any future prosecution on these same charges or for any same crimes that occurred during the period of time set forth in the indictment. Therefore, we reverse Goforth's conviction and render judgment on her behalf, discharging her.

¶72. **REVERSED AND RENDERED.**

---

[11] Like *Valentine*, the record in this case indicates that factual distinctions among the counts could have been made. *Valentine*, 395 F.3d at 633-34 (noting that some specification was possible, but "little effort was made to disaggregate the whole of the abuse and try the case in forty counts as charged"). For example, one incident involved Rigdon, while another involved Moore. And one incident, according to Doe, occurred in Goforth's former house. The failure to differentiate among the counts, therefore, was not due to a lack of information.

28

**CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**